# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MORTGAGE PAYMENT PROTECTION, INC.,**

                    **Plaintiff,**

-vs-                                                    Case No.   **6:08-cv-1212-Orl-22DAB**

**CYNOSURE FINANCIAL, INC.**

                         **Defendant.**


**CYNOSURE FINANCIAL, INC.**

                    **Counter Claimant,**

-vs-


**MORTGAGE PAYMENT PROTECTION, INC.,**

                    **Counter Defendant.**

_____

## ORDER

This cause comes before the Court for consideration of Plaintiff/Counter-Defendant Mortgage Payment Protection, Inc.'s ("MPPI") Motion for Summary Judgment (Doc. No. 216), Motion to Strike Affidavits (Doc. No. 229), and Motion for Attorneys' Fees.  (Doc. No. 212.)

-1-

Defendant/Counter-Plaintiff Cynosure Financial, Inc. ("CFI") responded in opposition to each. (Doc. Nos. 222, 226 & 230.)

## I. BACKGROUND

### A. Procedural Posture

MPPI, a Florida corporation, is an independent insurance broker and agency that solicits, recommends, and negotiates insurance on behalf of its clients.   (Doc. No. 154 p. 32; Joint Pretrial Statement, Admitted Facts.)   CFI, a Michigan corporation, is an independent insurance broker and agency which handles claims for various insurance programs.   (*Id.* at 32-33.)   On October 1, 2001, MPPI entered into a marketing agreement with CFI, which the parties amended in September 2005 (the "Amended Agreement.")   (Doc. No. 154 p. 33.)   Pursuant to the Amended Agreement, MPPI agreed "to work with CFI exclusively on the administration of mortgage IUI product." (Doc. No. 82-3 p. 2.)   MPPI, CFI, Virginia Surety Company, Inc., and General Electric Mortgage Insurance Corporation ("Genworth") entered into an agreement to provide Involuntary Unemployment Insurance ("IUI") in January 2004 (the "Genworth Four-Party Agreement").   (Doc. No. 19-4.) The terms of the Genworth Four-Party Agreement provided that CFI was to "be responsible for administration of the IUI coverage." (*Id.* at 3.)   However, MPPI wrote a new policy for Genworth (the "New Genworth Program"), placed the coverage with Small Business Consortiums ("SBC") rather than with VSC, and entered into an agreement with Southwest Re to perform the administration.   (Doc. No. 116 Ex. 2; Modarres Dep. 124:9-17); (Doc. No. 118, Ex. O.)   The New Genworth Program became effective on January 1, 2008.   (Doc. No. 116 Ex. 2 at 131:11-21.)   The Court granted CFI's prior motion for summary judgment in part and ruled that MPPI breached the exclusivity provision of the Marketing Agreement by using Southwest Re as the administrator of the

New Genworth Program instead of CFI.[1]   (Doc. No. 155 p. 26); (Doc. No. 169 p. 5.)   CFI maintains that as a result of MPPI's refusal to allow it to administer the New Genworth Program, it lost a 13% administration fee of premiums exceeding $400,000.00 per month, or approximately $52,000.00 per month. (Doc. No. 116 p. 15); (Doc. No. 226 p. 20.)   Because the Court determined that it could not on the then-existing record discern what, if any, damages CFI suffered as a result of MPPI's breach, it ordered the parties to file an amended Joint Pretrial Statement addressing the only issue remaining for trial—CFI's damages.   (Doc. No. 155 pp. 26, 30.)

In the amended Joint Pretrial Statement, CFI indicated that it would pursue "lost profits" damages and submitted a supplemental expert report to support its theory.   (Doc. No. 166 p. 15; Doc. No. 181-9.)   Upon MPPI's motion, the Court excluded the new expert report and supporting exhibits for failure to comply—without substantial justification—with Federal Rule of Civil Procedure 26(a).   (Doc. No. 205.)   The Court precluded CFI from pursuing the lost profits theory set forth in the supplemental report, cancelled the trial, and granted MPPI leave to file a motion for summary judgment addressing CFI's damages.   (Doc. Nos. 205 & 213.)   The Court will outline CFI's claims for damages before addressing the pending motions.

### B. CFI's Damages

As stated above, in its motion for summary judgment, CFI maintained that as a result of MPPI's refusal to allow it to administer the New Genworth Program, it lost a 13% administration fee of premiums exceeding $400,000.00 per month.   (Doc. No. 116 p. 15.)   In the original Joint Final Pretrial Statement, submitted on June 28, 2010, CFI estimated the monthly premiums to be

---

[1] The Court granted summary judgment for CFI on all of MPPI's claims, granted summary judgment for MPPI on CFI's tortious interference claim, and granted CFI summary judgment as to liability on its breach of contract counter-claim.   (Doc. No. 155.)

$400,000.00 and claimed a monthly loss of $53,000.00 (or 13% of the $400,000.00 monthly premiums). (Doc. No. 154 p. 31.) The original report of CFI's expert, David Hammel, reflected this figure. (Doc. No. 181-5.) Lacking the actual premium data (except for the month of January 2008), Mr. Hammel estimated the premiums based on the performance of the program while underwritten by VSC and administered by CFI, even though during the relevant time period it was underwritten by SBC and administered by Southwest Re. (Doc. No. 122 pp. 52:22-25 – 53:1-14.)

Upon filing the Amended Joint Pretrial Statement pursuant to the Court's order, CFI introduced a different damages calculation, which it specifically referred to as "lost profits." (Doc. No. 166 p. 15.) CFI relied on a Supplemental Expert Report by Mr. Hammel (the "Supplemental Report") to substantiate this calculation, in which Mr. Hammel reduced CFI's earned administration fee by the expenses and overhead associated with CFI's administration of the Genworth Program. (Doc. No. 181-9.) Instead of estimating the monthly premiums, Mr. Hammel calculated CFI's damages based on what CFI believed to be the actual premium data for the New Genworth Program, which it claimed to receive from a third party. (Doc. No. 181 p. 13.) Mr. Hammel's Supplemental Report consisted of six schedules, which detailed the overhead expenses and employee wages and benefits associated with the administration of the Genworth Program and reduced CFI's earned administrative fee to present value. (Doc. No. 181-9 p. 3.) Mr. Hammel calculated the portion of CFI's overhead attributable to the New Genworth Program by prorating the total overhead expense over the 30 accounts managed by CFI. (*Id.* at 9.) Among other items, the overhead calculation included rents, taxes, telephone, travel, office equipment leases, office expense, computer supplies, printing expense, and postage. (*Id.* at 8.) In its response to MPPI's motion to strike, CFI vigorously advocated for the introduction of this evidence, arguing that the "exhibits allow Mr.

-4-

Hammel to calculate CFI's damages to the penny and Mr. Hammel's opinion, while certainly not 'new,' is nonetheless substantially more refined with the exact data."  (Doc. No. 181 p. 20.) Finding the introduction of the lost profits theory set forth in the Supplemental Report at such a late stage to be prejudicial to MPPI, the Court excluded this evidence and limited CFI to introducing Mr. Hammel's original report, which the Court described as a "gross lost income theory."[2]    (Doc. No. 205.)

Now, in its response to MPPI's motion for summary judgment, CFI argues that its original calculation—13% of the $400,000 monthly administration fee—accurately reflects its damages, or its "benefit of the bargain."  (Doc. No. 226.)   According to CFI, at the time of MPPI's breach, CFI administered 30 insurance programs including the Genworth Program.  (*Id.* at 14.)   Relying on the affidavits of its President and Chief Financial Officer, CFI claims (1) it would not have incurred any direct costs to administer the New Genworth Program and (2) it did not save money as a result of MPPI's breach because it did not incur any additional overhead to administer the Genworth Program.  (Doc. Nos. 226-1 & 226-2.)   As such, CFI contends that its lost profits damages amount to 100% of its administration fee.  (Doc. No. 226 pp. 5-9.)   According to CFI, the controlling law

_____

[2] According to CFI, it "has not pursued a 'gross lost income theory' (at least not by that name or as interpreted by MPPI)," and it "has consistently sought to receive the benefit of its bargain with MPPI."  (Doc. No. 230 p. 4.)   However, in its response to MPPI's motion to strike Mr. Hammel's Supplemental Report, CFI referred to its damages calculations in terms of "gross" and "net" several times.  (*See* Doc. No. 181 p. 9) ("[Mr. Hammel's] projection indicated that the Genworth program would have generated approximately $400,000.00 per month in premiums.  Mr. Hammel then multiplied the lost premiums by 13% and concluded that CFI would have earned $52,000.00 per month in gross income."); (*Id.* at 13) ("CFI was due 13% of those premiums . . . as its administrative fee (gross lost income); CFI's sales expense and overhead during that period was then subtracted from the gross administrative fees (net lost income) and then reduced to present value . . . ."). Additionally, Mr. Hammel referred to the calculation in his original report as a "projection of gross lost profits" and to the calculation in the Supplemental Report as "lost profits."   (Doc. No. 181-9 p. 2.)

provides that the Court should not deduct from gross profits a party's fixed expenses, such as overhead, which neither increase nor decrease as a consequence of a breach.   (*Id.* at 5.)   Therefore, even lacking evidence of its costs and expenses, CFI argues that it can demonstrate a genuine issue of material fact that its damages amount to 100% of its administration fee because it would not have incurred additional direct costs to administer the New Genworth Program and it did not save overhead costs by not administering the program.   (Doc. No. 226.)

Addressing the apparent inconsistency between its claim for 100% of the administration fee with its previous calculation accounting for overhead and expenses, CFI explains that it introduced the latter theory "in an attempt to appear more reasonable and perhaps avoid a trial."   (Doc. No. 230 p. 6.)   According to CFI,

> Mr. Hammel's calculation of wages, benefits, and overhead was performed at the direction of CFI's attorneys to give the jury, the trier of fact, the option of considering whether to deduct those remote costs from the administration fee . . . . CFI was not required to do this, but did so in an attempt to give the jury an alternative, lesser, amount to award.   This was simply CFI's trial strategy.

(*Id.* at 16.)   Thus, CFI maintains that throughout the litigation, it has consistently sought its "benefit of the bargain" and has not taken any inconsistent positions with regard to damages.   (Doc. No. 226.)

In its prior order excluding Mr. Hammel's Supplemental Report, the Court referred to CFI's original theory as "gross lost income" and the new one as "lost profits." (Doc. No. 205.)   The Court's distinction between "gross lost income" and "lost profits" reflected its concern with the prejudicial effect of CFI's newly submitted evidence to establish its "lost profits"—a detailed expert report substantially more complex than the original.   (*Id.*)   MPPI now argues that CFI did not adequately disclose its intention to recover lost profits damages, and "[t]o the extent it has not

already done so, this Court should limit CFI to its theory of gross lost income, not only with respect to its expect David Hammel, but also for the remainder of the case."  (Doc. No. 216 pp. 9-10.) However, CFI originally claimed damages in the amount of "13% of $400,000.00," and CFI now submits evidence in support this amount by advancing a version of "lost profits" in which "lost profits" amount to "gross lost income."   (Doc. No. 226.)   Because this theory comports with the calculation set forth in the original Joint Pretrial Statement, the Court will not summarily reject CFI's claim for damages based on its exclusion of CFI's "lost profits" theory in its prior order. Ultimately, the Court recognizes that

> [t]he goal in awarding damages for breach of contract is to give the innocent party the benefit of his bargain to place him in a position equivalent to that which he would have attained had the contract been performed . . . . [T]he damages must be reduced by any benefits accruing to the plaintiff as a consequence of the breach . . . . [A]ny benefit to the plaintiff arising from or as a result of the breach must reduce the damages otherwise payable.

*Tel-Ex Plaza, Inc. v. Hardees Rests., Inc.*, 255 N.W. 2d 794, 796 (Mich. Ct. App. 1977) (internal citations omitted).[3]   Therefore, whether described as "lost profits" or "benefit of the bargain," CFI must adduce evidence to establish an award sufficient to put it in as good as a position as if the contract had been fully performed.  *Body Rustproofing, Inc. v. Mich. Bell Tel. Co.*, 385 N.W. 2d 797, 800 (Mich. Ct. App. 1986).

## C.   Pending Motions

In its renewed motion for summary judgment, MPPI argues that CFI cannot establish damages as a matter of law and lacks evidence to create a genuine issue of material fact.   (Doc. No.

---

[3] The Court has previously recognized, and the parties agree, that "[p]er the terms of the contracts, Michigan law governs the interpretation and construction of the CFI/MPPI contracts."   (Doc. No. 154 p. 33, Statement of Agreement as to Applicable Law); (Doc. No. 155 p. 2 n. 2.)

216.)   Additionally, MPPI moves to strike the affidavits CFI attached to its summary judgment response as conclusory, unsupported and inconsistent with CFI's previous submissions to the Court. (Doc. No. 229.)   Finally, MPPI moves for attorneys' fees against CFI, contending that CFI has unreasonably proceeded toward trial with an insufficient claim for damages.   (Doc. No. 212.)   The Court will first address the Motion to Strike, because the affidavits pertain to the Court's summary judgment determination.

## II. MPPI's MOTION TO STRIKE

In its response to MPPI's motion for summary judgment, CFI submitted the affidavits of Curt VandeVorde and Robert Lemcke, respectively the President and Chief Financial Officer of CFI, who testify that CFI would not have incurred any direct costs to administer the New Genworth Program and did not save any money by not administering the New Genworth Program.   (Doc. Nos. 226-1 & 226-2.)   MPPI moves to strike the affidavits on the grounds (1) that CFI filed the affidavits in bad faith, thus implicating the "sham affidavit" doctrine, (2) that the affidavits are conclusory and unsupported by facts in the record, and (3) that the affiants' testimony is internally inconsistent.   (Doc. No. 229.)   The Court will discuss each argument in turn, as well as the applicability of judicial estoppel, which CFI raises in its response.   (Doc. No. 230.)

### A. The "Sham Affidavit" Doctrine

"When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."   *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).   This principle, known as the "sham affidavit" doctrine, should be applied "sparingly."   *Rollins v. TechSouth, Inc.*,

833 F.2d 1525, 1530 (11th Cir. 1987).   Before striking an affidavit, the court must find "some inherent inconsistency" between an affidavit and the affiant's sworn testimony.   *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986).   The Eleventh Circuit Court of Appeals has emphasized that before finding an inherent inconsistency, the affiant must have clearly answered an unambiguous question.   *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) (quoting *Van T. Junkins*, 736 F.2d at 657).   "If no inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue 'even if it conflicts with earlier testimony in the party's deposition,' governs."   *Rollins*, 833 F.2d at 1530 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980)).[4]   Therefore, the court must distinguish between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."   *Tippens*, 805 F.2d at 953.

MPPI moves to strike the following two paragraphs of Mr. VandeVorde's affidavit, the first of which also appears in Mr. Lemcke's affidavit:

> 5. Had CFI acted as administrator of the Genworth Program from 2008 to 2010, it would not have incurred any "direct costs."   For example, CFI would not have hired any additional staff, leased any additional space, or purchased any additional equipment or supplies in conjunction with the Genworth Program.
>
> . . . .
>
> 8. CFI did not incur any additional overhead by performing the Genworth administration and hence did not "save" any money by not administering the program.

(Doc. No. 226-1; VandeVorde Aff.); (Doc. No. 226-2; Lemcke Aff.).   According to MPPI, the

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

affidavits contradict Mr. VandeVorde's prior deposition testimony, Mr. Hammel's Supplemental Report, and arguments previously advanced by CFI.   (Doc. No. 229.)

### 1. Mr. VandeVorde's Rule 30(b)(6) Deposition

MPPI contends that the above-stated paragraphs of Mr. VandeVorde and Mr. Lemcke's affidavits directly contradict several portions of Mr. VandeVorde's deposition.[5]   (Doc. No. 229 p. 9-14.)   During his deposition, MPPI questioned Mr. VandeVorde about the fee for which CFI could administer the Genworth Program:

> Q. . . .  In fact, you could do the Genworth program, couldn't you, for 12-and-a-half percent?
>
> . . . .
>
> A. No that's not true.   It's stated --
>
> Q. . . . From an economic standpoint, could you – could CynoSure have made money on the Genworth program at 12-and-a-half percent?
>
> . . . .
>
> A. I can't answer that.
>
> Q. Because you don't know as you sit here or why can't you answer it?

---

[5] MPPI does not attempt to demonstrate an inconsistency between Mr. Lemcke's previous deposition and his affidavit, but contends that Mr. Lemcke's affidavit conflicts with the testimony Mr. VandeVorde gave when deposed as CFI's corporate representative.   (Doc. No. 229 p. 12 n.4.) As the corporate representative, Mr. VandeVorde offered testimony on behalf of CFI.   Fed. R. Civ. P. 30(b)(6); *see Cont'l Cas. Co. v. First Fin. Emp. Leasing, Inc.*, 716 F. Supp. 2d 1176, 1189 (M.D. Fla. 2010) (quoting *Marker v. Union Fid. Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D. N.C. 1989)). Therefore, "[a]n attempt to retract without explanation an admission made in Rule 30(b)(6) deposition testimony may [] implicate the 'sham affidavit' doctrine." *Cont'l Cas. Co.*, 716 F. Supp. 2d at 1191 n.23 (citing *Van T. Junkins*, 736 F.2d at 657); *see also Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E. D. La. 2000), *aff'd* 31 Fed. Appx. 151 (5th Cir. 2001) (unpublished). Accordingly, the court will analyze both affidavits to determine whether it should invoke the "sham affidavit" rule based on an inherent inconsistency with Mr. VandeVorde's Rule 30(b)(6) deposition.

A. Well, when you say make money, what does that mean?

Q. Make a profit.

A. Do I make a dollar?  Do I make 30 percent?  What's a normal profit?
What's reasonable?   See, I don't know the answer to that.

Q. Could you have made a reasonable profit at 12-and-a-half percent?

A. No, I couldn't.

(Doc. No. 160; VandeVorde Dep. 316:7-25 – 317:9-11.)[6]   Additionally, MPPI refers to Mr.

VandeVorde's description of CFI's duties as an administrator for the Genworth Program.[7]   Finally,

MPPI points to Mr. VandeVorde's previous affidavit dated September 29, 2010, in which he states

that "[o]verhead for CFI's involuntary unemployment program is determined based on the size of

each respective program, calculated partially using the premiums reported from each individual

program."   (Doc. No. 181-6 ¶9.)

---

[6] MPPI also points to Mr. VandeVorde's testimony about an email he sent to MPPI suggesting that
CFI could make a small profit with a 17.5% administration fee.   (Doc. No. 160; VandeVorde Dep.
315:5-22).    However, Mr. VandeVorde does not clearly confirm whether the "17.5%"
administration fee discussed in the email refers to the New Genworth Program.   (Doc. No. 160;
VandeVorde Dep. 314:18-25—315:1-3.)

[7] When questioned about the adequacy of CFI's administration fee, Mr. VandeVorde explained the
expenses associated with administering the Genworth Program:

> A . . . . I can't tell you every single expense we have in our company, but I can tell
> you that, you know, our admin fee goes to pay for a lot of services that we had to do
> that MPPI didn't have to do.   You know, we had to – every month the data came in
> from MMPI, the premium came in, we had to reconcile it all to the data.   There was
> also – you know, there was – then we have to report it to Virginia Surety in the
> format that they want.   We have to mail out.   We have to print and mail out.

(Doc. No. 160; VandeVorde Dep. 313: 6-16.)

Both affiants aver that CFI would not have incurred direct costs to administer the New Genworth Program and Mr. VandeVorde avers that CFI did not save any costs by not administering the New Genworth Program. (Doc. Nos. 226-1 & 226-2.) Based on the affidavits, CFI argues that it is legally entitled to 100% of its fee as damages. (Doc. No. 226.) According to MPPI, "[i]t is implausible that for an income stream of approximately $53,000.00 per month and with the above administration duties, CFI would have incurred no incremental, direct or variable costs or additional overhead." (Doc. No. 229 p. 14.) However, the affiants do not inherently contradict Mr. VandeVorde's testimony that CFI could not have made a "reasonable profit" if CFI earned a 12.5% administration fee, such that the Court must disregard the affidavits as a matter of law. First, Mr. VandeVorde did not give a "clear" answer to an "unambiguous" question about CFI's overhead and direct costs. *See Lane*, 782 F.2d at 1532. Second, Mr. VandeVorde's prior testimony concerned CFI's potential profit, but Mr. Lemcke and Mr. VandeVorde testify in their affidavits about their administration costs. Further, in neither his prior testimony nor his prior affidavit does Mr. VandeVorde explicitly address the expenses CFI saved by not administering the program. Finally, though Mr. VandeVorde describes CFI's administrative expenses in his deposition, he does so in terms too general to demonstrate an "inherent inconsistency" with the affidavits. In light of the Eleventh Circuit's instruction that the sham affidavit rule be applied "sparingly," the Court finds that any inconsistency between the affidavits and Mr. VandeVorde's prior testimony relates to the affiants' credibility. *See Tippens*, 805 F.2d at 954.

## 2. Mr. Hammel's Supplemental Report and CFI's Pleadings

MPPI contends that the affidavits contradict CFI's previous filings with the Court, specifically Mr. Hammel's Supplemental Report and CFI's response to MPPI's motion to strike it.

(Doc. No. 229 pp. 14-15.)   In his Supplemental Report, Mr. Hammel allocated overhead and wages for the New Genworth Program and deducted it from the administration fee.   (Doc. No. 181-9.) CFI argued that this calculation most accurately reflected its damages.   (Doc. No. 181.)   However, the Court applies the sham affidavit doctrine only when an affidavit contradicts sworn testimony. *See Van T. Junkins*, 736 F.2d at 657.   Therefore, the Court cannot strike either affidavit on this ground.

### 3. Commission

Both Mr. VandeVorde and Mr. Lemcke aver that "[i]n the event that CFI recovers damages from MPPI for MPPI's failure to use CFI to administer the Genworth Program, CFI will have to pay a commission to Nancy Pritchett, an independent contractor who worked with CFI on the Genworth Program."   (Doc. Nos. 226-1 & 226-2.)   MPPI argues that the commission is a "direct cost," which contradicts the affiants' statement that CFI would not have incurred any direct costs.   (Doc. No. 229 p. 9 n. 3.)   CFI responds that the commission payment is not a cost CFI would have saved by virtue of not administering the New Genworth Program.   (Doc. No. 226 p. 20 n. 7.)   However, this issue is inapposite to the Court's determination on summary judgment because the Court cannot weigh an affiant's credibility or resolve the factual dispute of whether the commission constitutes a direct cost.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B. Conclusory and Unsupported Averments

MPPI moves to strike Mr. VandeVorde's and Mr. Lemcke's affidavits as conclusory, unsupported, and uncorroborated, because the financial documents allegedly supporting the affiants' statements about overhead and direct costs are not in the record. (Doc. No. 229 p. 16.) According to Rule 56(c), "[a]n affidavit or declaration used to support or oppose a motion must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A).[8] "[C]onclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).

Because the affiants testify to specific supporting facts concerning CFI's administration of the Genworth Program, the affidavits are neither conclusory nor uncorroborated. *See Leigh*, 212 F.3d at 1210. For example, Mr. VandeVorde testifies that CFI would not save any money by not administering the New Genworth Program based on CFI's administration of the Genworth Program. (Doc. No. 226-1 ¶ 8.) In response to MPPI's argument that the averments lack support in the record, CFI claims that because the affiants testify to a "negative proposition" of the absence of costs, no data exists to prove the point: "it is absence of increased costs which make the statements in the affidavits true." (Doc. No. 230 p. 21.) The Court questions this logic. However, because the affiants do not refer to specific documents, striking the affidavits on the grounds that they are not bolstered by "supporting documentation" would require an inappropriate weighing of the affiant's credibility. *See Anderson*, 477 U.S. at 255. Furthermore, "[w]ith regard to affidavits from

---

[8] Pursuant to the amendment of Rule 56, effective December 1, 2010, "[t]he requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record." Fed. R. Civ. P. 56(c)(4), advisory committee's note.

corporations, either a corporate officer or a custodian of records is presumed to possess personal knowledge of a fact contained in the corporation's records." *D'Aprile v. Unum Life Ins. Co. of Am.*, No. 2:09-cv-270-FtM-36SPC, 2010 WL 3810845, at *1 (M.D. Fla. Sept. 24, 2010) (internal citations and quotations omitted).

### C. Judicial Estoppel

CFI responds that by moving to strike the affidavits, MPPI essentially argues that CFI should be judicially estopped from relying on the affidavits as contradictory to CFI's prior position on damages. (Doc. No. 230 p. 8.) "Judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." *Stephens v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006) (quoting *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005)). However, judicial estoppel applies when a party advances divergent positions in two *separate* proceedings. *See id.* ("A district court may invoke the doctrine 'to prevent a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.' "). In any event, the Court does not find that the circumstances of this case amount to a "cold manipulation" of the judicial process and therefore will not invoke judicial estoppel to exclude the affidavits. *See Ajaka v. Brooksamerica Mortg. Corp.*, 453 F.3d 1339, 1345 & n.7 (11th Cir. 2006) (reasoning that for judicial estoppel to apply, a party must intend to change positions "after the fact to gain an unfair advantage," such that the party acts with "cold manipulation and not an unthinking or confused blunder") (internal citations and quotations omitted). Therefore, the Court will not exclude the affidavits.

### III. MOTION FOR SUMMARY JUDGMENT

### A. Applicable Law

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden to demonstrate that there is no genuine issue of material fact by referring to the materials on file. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (internal citations omitted). The moving party can satisfy this burden by either "negating an element of the non-moving party's claim" or by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant carries its initial burden, then the non-movant must show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court views the facts in the light most favorable to the party opposing the motion. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

## B. Choice of Law

A federal court exercising jurisdiction based on diversity of citizenship applies the choice of law rules of the forum state to determine the substantive law which governs the action. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). The Court has previously recognized, and the parties agree, that "[p]er the terms of the contracts, Michigan law governs the interpretation and construction of the CFI/MPPI contracts." (Doc. No. 154 p. 33, Statement of Agreement as to Applicable Law); (Doc. No. 155 p. 2 n. 2.)

Because the measure of recovery is a substantive issue, the Court applies Michigan law in its

damages analysis.   *See McDermott v. Middle E. Carpet Co., Associated*, 811 F.2d 1422, 1426 (11th

Cir. 1987).   When applying state substantive law, a federal court is "bound to decide the case the

way it appears the state's highest court would."   *Risley v. Nissan Motor Corp. USA*, 254 F.3d 1296,

1299 (11th Cir. 2001).   If the highest court in the state has not "spoken to an issue," a federal court

"must adhere to the decisions of the state's intermediate appellate courts absent some persuasive

indication that the state's highest court would decide the issue otherwise."   *Chepstow Ltd. v. Hunt*,

381 F.3d 1077, 1080 (11th Cir. 2004) (quoting *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d

1285, 1290 (11th Cir. 2001)).   Additionally, Florida's choice-of-law rules provide that "procedural

matters are governed by Florida law, even where another forum's substantive law applies."

*McMahan v. Toto*, 256 F.3d 1120, 1133 (11th Cir. 2001).   As this Court previously recognized,

Florida law regarding the burden of proof applies.   (*See* Doc. No. 169 p. 10.)

## C. Proof of Damages

In Michigan, "[t]he remedy for breach of contract is to place the nonbreaching party in as

good a position as if the contract had been fully performed."   *Corl v. Huron Castings, Inc.*, 544

N.W. 2d 278, 280 (Mich. 1996).   Lost profit damages represent one form of a nonbreaching party's

expectation interest.   *Goodwin, Inc. v. Coe*, 233 N.W. 2d 598, 602 (Mich. Ct. App. 1975).

Therefore, "[d]amages for lost profits are based on the loss of net rather than gross profits."

*Lawton v. Gorman Furniture Corp.*, 282 N.W. 2d 797, 801 (Mich. Ct. App. 1979) (internal citations

omitted).   The non-breaching party must deduct expenses that would have been incurred to

complete the contract.   *Brodsky v. Allen Hayosh Indus., Inc.*, 137 N.W. 2d 771, 774-75 (Mich. Ct.

App. 1965) ("The lost profit is computed by subtracting the expenses, as determined by acceptable

accounting procedures, that plaintiff would have incurred in fulfilling his contractual obligation . . . .").   Because the measure of damages must reflect the actual loss suffered as a result of the breach, "deduction of any saving to the injured party must be made."   *Goodwin*, 233 N.W. 2d at 603.

Lost profits must be established with reasonable certainty rather than on speculation or conjecture.   *Premier ATMS, Inc. v. Daisy Fresh, Inc.*, 23 So. 3d 1282, 1283 (Fla. 4th DCA 2010) (internal citations omitted).   "In lost profits cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages."   *Nebula Glass Intern., Inc. v. Reichold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006) (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1350-51 (Fla. 1989)).   "While an inability to provide an exact or precise amount will not preclude recovery, the evidence must establish lost profits with reasonable certainty such that an impartial and prudent mind would be satisfied."   *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 653 (11th Cir. 1992) (interpreting Florida law) (internal citations omitted).   Proof of damages "may be indirect and [] may include estimates based on assumptions, so long as the assumptions rest on adequate data."   *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1539 (11th Cir. 1985) (internal citations and quotations omitted).

In its prior order, the Court excluded Mr. Hammel's Supplement Report and limited CFI to introducing Mr. Hammel's original report.   (Doc. No. 205.)   In the original report, Mr. Hammel opined as follows:

> Based on the Genworth IUI program activity history, the program, while underwritten by SBC, has generated approximately $400,000.00 per month in premiums.   As administrator of the program, CFI was due to receive 13% of the

premiums generated.   Therefore, CFI was due to receive a total of approximately $52,000.00 per month as the program administrator.   CFI has suffered a loss of income of $52,000.00 per month since the Genworth program was underwritten by SBC and will continue to suffer this loss in the future as long as the program continues to run.

(Doc. No. 177-3.)[9]   MPPI argues that CFI's evidence is insufficient with respect to (1) the gross administration fees CFI allegedly would have received as administrator of the New Genworth Program and (2) the expenses and costs CFI would have incurred in connection with its administration.   The Court finds that MPPI meets its initial burden on summary judgment, such that CFI must then demonstrate that a genuine issue of material fact exists regarding whether it can prove damages with a reasonable certainty.   Upon closer scrutiny of the evidence, the Court finds that CFI does not establish a genuine issue of material fact with respect to its damages.

MPPI argues that CFI cannot establish its gross administration fee because it cannot introduce documentary evidence of the New Genworth Program premiums, which third parties possess and CFI did not obtain during discovery.[10]   (Doc. No. 216 p. 12.)   Further, MPPI contends that no CFI employee can testify to the New Genworth Program premiums because no CFI employee has first-hand knowledge of the premiums.   (Id. at 13.)   Thus, MPPI argues that CFI's attempt to establish the administration fees requires speculation, particularly in light of the fact that

_____

[9] CFI's claim for damages in the parties' original Joint Pretrial Statement reflected this theory: "$1,007,000.00 for damages incurred by MPPI's failure to use CFI as claims administrator for the Genworth program as of February, 2008, continuing to the present.   At the time of trial, the new Genworth program will have run for nineteen months, with a monthly loss to CFI of $53,000.00. The loss incurred by CFI is $1,007,000.00." (Doc. No. 154 p. 31.)

[10] In November 2010, CFI attempted to compel production of the premium data through trial subpoenas served on third parties, but the Court quashed them as untimely discovery requests. (Doc. Nos. 202, 204, & 208.)

the actual premium data exists.   (*Id.* at 14.)   Essentially, MPPI argues that the "nature of the case"

permits CFI to estimate its damages with more certainty.   (*Id.* at 12-13.)

CFI estimates the premiums generated by the New Genworth Program based on the

premiums generated by the Genworth Program, as well as the premium for the New Genworth

Program generated in January of 2008.   (Doc. No. 226 p. 18.)   To establish a genuine issue of

material fact, CFI relies on Mr. Hammel's testimony that he estimated the premiums based on the

previous twelve months of premiums generated by the Genworth Program when administered by

CFI:

> Q. Where did you obtain your estimate of the premiums per month for the Genworth IUI program as it is being underwritten by SBC?
>
> A. Well, it's contained in my opinion that you will soon see of my analysis that I did, which was approximately taking the last 12 months of premiums that were received by CPI [sic], which reflected – regarding their administration fee in those last 12 months of total premiums, it came out to $4,942,580.35.   I divided that by an average of 12 months and came out with a balance of $411,811.   As with the TPA work, which was per the agreement 13 percent, the 13 percent equaled $642,535.45.   I divided that total into 12 and came out with $53,544.62 per month that CFI appeared to have been – lost as far as the Genworth commissions.
>
> So if I actually had the real numbers, I would have opined to what I would construe to be the final numbers.   So as I stated in the report, it's an approximate of – they lost approximately $52,000 a month.

(Doc. No. 122; Hammel Dep. 52:19-25 – 53:1-14.)   CFI further relies on the testimony of Mr.

Modarres, who testified as MPPI's Corporate Representative:

> Q. How much in premium, effect [sic] January 1st of 2008, how much in premiums did the Genworth program – has the Genworth program generated between January of '08 through the present on a monthly basis?
>
> A. I mean, that's confidential.   I cannot . . . inform you about that.
>
> . . . .

Q. . . . And what were the monthly premiums on the Genworth account when MPPI offered CFI 13 percent of the monthly premium?

A.   Okay.   That was – that wasn't the question you asked me previously, but I will answer that question.   But that wasn't the question you asked previously.

Q.   I'll get back to the question I asked.   Mr. Modarres.   Can you answer that one?

A.   Yes.   At the time, it was somewhere around $400,000, give and take, I'm not sure, again.   I don't remember the figures.

Q.   Was that a month?

A.   A month.

A.   $400,000 per month.   Right?

Q.   Roughly, yeah . . . .

(Doc. No. 128; Moddares Dep. 96:6-11 – 97:7-22.)   As discussed below, taking all reasonable inferences in favor of CFI, this evidence does not create a genuine issue of material fact as to whether CFI can establish its gross administration fee to a reasonable certainty at trial.

The Eleventh Circuit has noted that where a party could have established lost profits with reasonable certainty, it cannot claim that uncertainty as to the exact amount does not preclude recovery.   *See Johnson Enters. of Jacksonville v. FPL Grp., Inc.*, 162 F.3d 1290, 1325 n.81 (11th Cir. 1998) ("Because it is clear that [the party] could have established its lost profits with reasonable certainty, it could not have sought comfort under the Florida rule that 'uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong.   Inability to give the exact or precise amount of damages does not preclude recovery.' " (quoting *Conner v. Atlas Aircraft Corp.*, 310 So.

-21-

2d 352, 254 (Fla. 3d DCA 1975))).   Similarly, in this context, an estimation based on the past

premium data does not suffice to create a genuine issue of material fact as to whether CFI can

establish its damages within reasonable certainty when the actual premium data is available.

Ultimately, CFI's estimation of the fee it would have earned administrating the New Genworth

Program is too speculative.

     Furthermore, a party must establish "expenses with some specificity" to prove lost profits

with reasonable certainty.   *Clayton*, 954 F.2d at 652 (citing *Born v. Goldstein*, 450 So. 2d 262, 264

(Fla. 5th DCA 1984)).   CFI argues that its "fixed costs," such as overhead, which did not change as

a result of MPPI's breach, should not be deducted from its gross administration fee.[11]   (Doc. No.

226 pp. 10-14.)   CFI relies on the affidavits of Mr. VandeVorde and Mr. Lemcke to establish that it

would not have incurred additional direct costs to administer the New Genworth Program and that it

did not save any fixed costs by not administering the New Genworth Program.   (Doc. Nos. 226-1 &

226-2.)   Even assuming that "fixed costs" which a party does not save by way of the breach do not

have to be deducted from gross profits, CFI's evidence does not create a genuine issue of material

fact of whether a reasonable jury could determine CFI's expenses, or lack thereof, to a reasonable

certainty.   *See Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1317 (11th Cir. 2001) (holding that a

---

[11] Courts disagree about whether the aggrieved party must deduct a portion of fixed overhead expenses as a cost when computing lost profits.  *See* 22 Am. Jur. 2d *Damages* § 460 (2011) (recognizing split).   "Overhead expenses include both fixed and variable expenses.   Fixed expenses are the continuous expenses of the business that are incurred regardless of the loss of a portion of the business, for example rent, taxes, and administrative salaries.   Variable expenses, also called direct expenses, are costs directly linked to the volume of business."   *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W. 3d 50, 56 (Mo. 2005) (citing *Universal Power Sys., Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 673 (8th Cir. 1987)).   Whether this rule applies in Michigan is unclear, and CFI does not cite any Michigan cases in support of its argument. Regardless, the Court will not address this issue in light of its finding that CFI's evidence of its gross administration fee is too speculative.

party must produce evidence of historical income and expenses and cannot rely on generalizations in an affidavit).   Thus, the Court grants MPPI's motion for summary judgment.

### IV. MOTION FOR ATTORNEYS' FEES

MPPI moves the Court for attorneys' fees pursuant to 28 U.S.C. § 1927, which provides that "[a]ny attorney or other person . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."   MPPI argues that CFI has acted unreasonably and vexatiously by proceeding with trial on a legally deficient claim for damages. (Doc. No. 212.)   While the court finds that CFI's damages theory is insufficient to survive summary judgment, "[f]or sanctions under section 1927 to be appropriate, something more than a lack of merit is required."   *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003).   The record does not support a finding that CFI's attorney "willfully abuse[d] the judicial process by conduct tantamount to bad faith."   *Id.* (internal citations and quotations omitted).

### V. CONCLUSION

Based on the foregoing, it is **ORDERED** as follows:

1.   MPPI's Motion to Strike Affidavits (Doc. No. 229), filed on December 24, 2010, is **DENIED**.

2. MPPI's Motion for Summary Judgment (Doc. No. 216), filed on November 16, 2010 is **GRANTED**.

3. MPPI'S Motion for Attorneys' Fees (Doc. No. 212), filed on November 9, 2010, is **DENIED**.

4. The Clerk shall enter a final judgment providing that Mortgage Payment Protection, Inc. shall recover nothing on its claims against Cynosure Financial, Inc.   Further, the Clerk shall enter a final judgment providing that Cynosure Financial, Inc. shall recover nothing on its counter-claims against Mortgage Payment Protection, Inc.

5. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on July 7 , 2011.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party

-24-